UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:17 CR 49 CDP (JMB) |
| | ) | |
| TOMMIE ANDERSON, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Currently before the Court is Defendant Tommie Anderson's Motion to Suppress

Evidence and Statements.  (ECF Nos. 21, 41)  The government filed an opposition.  (ECF Nos.

22, 42)  Pretrial matters, including any motions to suppress, have been referred to the

undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b).

**BACKGROUND**

In his Motion to Suppress, Anderson asks the Court to suppress evidence seized from his

mother's residence.  Anderson contends that the police lacked valid consent to search the

residence.  Anderson further contends that any statements he made to the police must be

suppressed because he did not voluntarily and freely waive his Miranda rights.

In its opposition, the government argues that Anderson failed to identify his standing to

challenge the search of his mother's residence, the police had consent to search the residence, the

police advised Anderson of his Miranda rights, and Anderson voluntarily spoke with the police.

On May 26, 2017, the undersigned held an evidentiary hearing on Anderson's Motion to

Suppress.  Anderson was present and represented by Assistant Federal Public Defender Felicia

Jones.  The government was represented by Assistant United States Attorney Thomas Mehan. At the hearing, the government presented the testimony of St. Louis County Police Detectives Josiah Merritt and Justin Adams.  Generally speaking, Det. Merritt testified regarding the arrest of Anderson on August 19, 2016, and his interaction with Robert Poole, who consented to the search of a residence at 12897 Fox Haven, St. Louis County, MO.  Det. Merritt further testified regarding statements Anderson made while in police custody at 12897 Fox Haven.

Det. Adams testified that he was investigating Anderson relative to a 2015 shooting, and that he arrived at the 12897 Fox Haven residence after the consent search had begun and after officers seized a handgun from a bag/purse in the residence.  Det. Adams testified that he spoke with Anderson's mother, Marilyn Sumpter, who called while Det. Adams was at the residence. Det. Adams also testified about a video/audio-recorded interview of Anderson that he conducted later on August 19, 2016.

Both detectives testified about their interactions with Lisa Akins, Anderson's girlfriend, and her consent to search her vehicle and the apartment she shared with Anderson at 1751 Santa Delora Walk, Apt. A, St. Louis, MO.  The searches of Akins' vehicle and Santa Delora Walk apartment have not been challenged.

Anderson presented the testimony his mother, Marilyn Sumpter and his uncle, Robert Poole.  Ms. Sumpter testified regarding Anderson's association with the 12897 Fox Haven residence, the physical and intellectual abilities of her brother Robert Poole, and her telephonic interactions with Det. Adams.  Mr. Poole testified regarding the events of August 19, 2016, including his consent to search the 12897 Fox Haven residence.

The Court received three exhibits from the government in connection with the evidentiary hearing.  Government's Exhibit A was a copy of a Miranda Warning and Waiver Form, signed by Anderson, dated August 19, 2016.  Government's Exhibit B was a copy of a Consent to

Search Form for 1751 Santa Delora Walk, Apt. A, signed by Lisa Akins.  Government's Exhibit C was a copy of a Consent to Search Form for 12897 Fox Haven, signed by Robert Poole, albeit with the letters "r P P O O I L."  Anderson submitted two exhibits.  Defendant's Exhibit A was a copy of a medical record for Robert Poole from Barnes Jewish Hospital for service provided on June 18, 2015.  Defendant's Exhibit B was a "Case Analysis" for Robert Poole, from the Social Security Administration, dated September 3, 2010.  Defendant's exhibits contain sensitive medical information and were received for the purpose of establishing his general disability.  The undersigned received Defendant's exhibits over the government's objection.

Based on the testimony and evidence adduced at the May 26, 2017, evidentiary hearing, and having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses during that hearing, and having fully considered the parties' pleadings, including post-hearing submissions (ECF Nos. 41, 42), the undersigned makes the following findings of fact, conclusions of law, and recommendations.

## FINDINGS OF FACT

Marilyn Sumpter is Tommie Anderson's mother.  Robert Poole is Ms. Sumpter's brother and Anderson's uncle.  Mr. Poole is disabled and lives with Ms. Sumpter and her two minor children at 12897 Fox Haven, in St. Louis County, Missouri.  According to Ms. Sumpter, Anderson routinely stays at her Fox Haven home, often sleeping in the basement, on the couch, or in her bed when she is not home.  Ms. Sumpter testified that Anderson keeps and cares for two dogs at the Fox Haven residence.  Anderson also stays with his girlfriend Lisa Akins, including at her apartment at 1751 Santa Delora Walk, Apt. A, St. Louis, MO.

Records and testimony indicate that Mr. Poole has vision, mobility, and intellectual limitations.  Mr. Poole is 50 years old, but his appearance and demeanor suggest an older person.

Ms. Sumpter testified that Mr. Poole is "mentally retarded,"[1] legally blind, and has suffered from disabling conditions since birth.  Mr. Poole has lived with Ms. Sumpter since their mother passed away.  The extent of Mr. Poole's disability, as it relates to his consent to search 12897 Fox Haven, will be discussed in greater detail below.

Josiah Merritt is a detective with the intelligence unit of the St. Louis County Police.  Det. Merritt has almost 15 years of police experience.  Justin Adams is a homicide detective with the St. Louis County Police.  In the summer of 2016, the St. Louis County Police were investigating a 2015 shooting in St. Louis County, MO.  The investigation identified Tommie Anderson, the defendant herein, as a suspect/participant in the 2015 shooting.  In June 2016, Anderson was shot, and by August 2016, Anderson was also wanted by the police in connection with a homicide investigation.

Based on records and databases available to the police, Det. Merritt identified 12987 Fox Haven Drive as an address associated with Anderson.  On August 19, 2016, Det. Merritt and other officers went to the Fox Haven residence hoping to locate and arrest Anderson.

On August 19, 2016, Ms. Sumpter was away from the 12987 Fox Haven residence visiting another adult son who is incarcerated in the Missouri Department of Corrections.  Ms. Sumpter's minor children were not home.  Mr. Poole was initially home alone; at some point before the police arrived, Anderson and his girlfriend came to the Fox Haven residence.

When Det. Merritt approached 12897 Fox Haven, he observed Anderson coming out of the residence with a woman later identified as Anderson's girlfriend, Lisa Akins.  Det. Merritt

---

[1] As discussed below, the undersigned closely observed Mr. Poole in court.  Mr. Poole demonstrated no limitations in his ability to hear and generally understand questions posed to him.  Mr. Poole responded to questions appropriately in terms of content and context, without noticeable hesitation.  Mr. Poole asked for clarification when appropriate.  Thus, although the undersigned concludes that Mr. Poole is no doubt disabled and his intellectual functioning somewhat impaired, his intellectual abilities were greater than suggested by Ms. Sumpter's testimony.

arrested Anderson relative to the 2015 shooting incident/investigation and conducted a search of Anderson incident to the arrest.    Anderson asked Det. Merritt to retrieve his cigarettes for him from the house.  Anticipating a search of the Fox Haven residence, Det. Merritt asked Anderson if there were any dangerous items in the house.  Anderson stated that there were not.

After the police arrested Anderson, Mr. Poole came out of the house and approached the police.  Det. Merritt initially encountered and spoke with Mr. Poole outside of the Fox Haven residence.  Det. Merritt testified that Mr. Poole was an elderly looking gentleman who seemed to understand what was going on when they spoke.  Mr. Poole asked why the police were there. Det. Merritt explained to Mr. Poole generally why the police were present, and advised Mr. Poole that the police believed that Anderson might have a weapon inside the residence and they would like to look for it.  Mr. Poole invited the police inside the Fox Haven residence.

After Mr. Poole invited Det. Merritt inside the residence, the two went into a kitchen area where Det. Merritt reviewed a written Consent to Search form with Mr. Poole.  Mr. Poole told Det. Merritt that he could not write well.  Det. Merritt asked Mr. Poole to try to write his name on the form.  Mr. Poole wrote the letters "r P P O O I L" near a signature line.  Det. Merritt testified that he filled out the majority of the form and that he read the form to Mr. Poole.  Det. Merritt did not threaten Mr. Poole or make any promises to him in order to obtain consent to search.  At some point, Mr. Poole told Det. Merritt that he lived at the Fox Haven residence with his sister and that Anderson came over to care for the dogs and to do laundry.

While inside the Fox Haven residence with Mr. Poole, Det. Merritt observed an open bag on the table described in testimony as a purse.  Det. Merritt testified that he could see a handgun inside the bag, and that after Mr. Poole signed the consent form, the police seized the gun from the purse.  Mr. Poole advised that the bag was not his.  Det. Merritt asked Mr. Poole to accompany him through the residence to help identify any items that belonged to Anderson.

After seizing the gun, Det. Merritt went outside where Anderson was detained.  Det. Merritt advised Anderson of his <u>Miranda</u> rights.  Anderson indicated to Det. Merritt that he knew what he was doing, he had done nothing wrong, and he would talk.  Anderson advised that he lived in an apartment with his girlfriend, but that he slept wherever his day ended, which was not usually at the Fox Haven residence.

After Anderson's arrest and the seizure of the handgun, Det. Adams arrived at the Fox Haven residence.  Also at some point, Mr. Poole placed several telephone calls to Ms. Sumpter. As noted above, Ms. Sumpter was visiting another son in prison on August 19, 2016, and was not able to receive her phone calls while in the prison facility.  While Det. Adams was still at the Fox Haven residence, Ms. Sumpter returned Mr. Poole's calls.[2]  According to Ms. Sumpter, Mr. Poole told her that the police had trashed her house.  Ms. Sumpter asked to speak with the police. Mr. Poole located Det. Adams, who was outside the residence.  Det. Adams spoke briefly on the phone with Ms. Sumpter.  Ms. Sumpter indicated that she did not want the police searching her home.  Det. Adams declined to provide Ms. Sumpter with details regarding Anderson's arrest, but called her the next day after Anderson was formally charged.  Det. Adams had only a limited interaction with Mr. Poole.

Ms. Sumpter testified that Mr. Poole told her the police said she agreed that it would be okay for Mr. Poole to walk the police in the house.  The undersigned does not credit this

---

[2] In his post-hearing brief (styled as a "Supplemental Motion to Suppress Evidence"), Anderson contends that Mr. Poole called Ms. Sumpter "while the police were outside, before they entered the house."  (ECF No. 41 at 2)  While this contention may be technically accurate, it is misleading absent full context.  Mr. Poole testified that he did not speak with Ms. Sumpter before the police came into the house.  (Tr. at 79)  Although Mr. Poole may have attempted to call Ms. Sumpter early during his interactions with the police, the record makes abundantly clear that Mr. Poole did not actually speak with Ms. Sumpter until she returned his call, which was <u>after</u> Det. Adams arrived, and which was <u>after</u> the police had located and seized the firearm. Thus, if Ms. Sumpter told the police to leave her house or stop the search, that directive occurred <u>after</u> the police seized the gun.

testimony.  Mr. Poole's testimony, both specifically and when considered as a whole, contradicts this aspect of Ms. Sumpter's testimony.  Further, Ms. Sumpter has a clear bias in favor of her son.  Ms. Sumpter's hearing testimony overstates Mr. Poole's limitations, which also undermines her credibility.  For example, she testified that she does not leave Mr. Poole home by himself, but Mr. Poole's testimony indicates that he was home alone on August 19, 2016, before Anderson arrived and was likely to have been left alone after Anderson left but before Ms. Sumpter returned home.

Mr. Poole testified that he recalled the day the police came to the Fox Haven residence. Mr. Poole represented that he was home alone and then Anderson came over with Ms. Akins. Regarding Anderson's arrest, Mr. Poole testified that he came upstairs and the front door was open and he saw Anderson outside with the police, first standing in the grass and later Anderson sitting.

Mr. Poole initiated contact with the police.  Mr. Poole testified that he walked over to an officer to ask what was going on.  According to Mr. Poole, the officer asked if they could go inside and Mr. Poole obliged.  Mr. Poole testified that he did not understand the consent form he signed.  Mr. Poole recalled writing his name on the form.  Mr. Poole was shown a copy of the consent form (Gov't Exh. C), and stated he could not read that form but that it looked like the same form because he remembered the symbol in the corner (the St. Louis County Police logo). Mr. Poole testified that he was in the kitchen area during the search, but denied seeing a gun and denied being asked about the purse.

Mr. Poole testified that the police told him they had not talked to Ms. Sumpter and that he did not need to call her, but he called her anyway.  Although Mr. Poole eventually spoke with Ms. Sumpter on the telephone, that conversation occurred after the police had already been in the house and conducting a search.

Det. Adams also interviewed Ms. Akins, who gave consent to search the apartment she shared with Anderson at 1751 Santa Delora Walk.  (Gov't Exh. B)  Ms. Akins drove herself to the apartment and Det. Adams followed her.  Ms. Akins advised that Anderson kept a gun in purse that he carried over his shoulder.  Ms. Akins' statements and the search of her vehicle and apartment are not contested herein.

Det. Adams arranged for Anderson to be conveyed to a police station where Anderson was placed in an interview room with audio and video recording capability.  Det. Adams advised Anderson of his rights using a written form, which Anderson signed.  (Gov't Exh. A)  Det. Adams testified that no threats or promises had been made to Anderson, Anderson did not appear to be under the influence, and Anderson did not appear to be in pain or discomfort.  Anderson initialed each of his rights and signed under a block which read as follows:

> I have read the above statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

(Id.)  The form was dated "8-19-16" with a time of "4:00 pm."  Anderson made some statements, but he eventually declined to speak further and the Detective terminated the interview.

There is no indication in the record before the Court that Anderson or anyone else advised any police officer that Anderson was under the influence of pain medication on August 19, 2016.  Likewise, there is no indication in the record before the Court that Anderson or anyone else advised any police officer that Anderson was in such serious pain or discomfort that he was not able to freely and voluntarily speak with police.

Det. Adams also testified that he reviewed recorded jail calls between Anderson and Ms. Sumpter.  In one of the calls Anderson advised Ms. Sumpter that he was not happy with Mr. Poole because he cooperated with the police, indicating that he wanted to punch Mr. Poole, and

noting in substance that, despite Mr. Poole's limitations, he has enough common sense not to help the police.

Additional findings of fact are included in the following discussion, conclusions of law, and recommendations.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATIONS

Anderson asks the Court to suppress all physical evidence seized from 12897 Fox Haven, on August 19, 2016, and to suppress all statements he made to law enforcement on August 19, 2016. Anderson contends that Mr. Poole's consent to search the Fox Haven residence was not valid due to Mr. Poole's disability. In his post-hearing Supplemental Motion to Suppress, Anderson further argues that Ms. Sumpter unambiguously denied the officers permission to enter and search the Fox Haven residence. Anderson also argues that his statements to the Police on August 19, 2016, were not voluntary because he was in pain and receiving pain medication as a result of a gunshot wound he suffered approximately two months earlier.

The record is sufficiently developed to permit a determination as to the issues concerning of the challenged events and statements.

## I. Motion to Suppress Evidence Seized from 12897 Fox Haven

### A. Anderson's Standing

Although the Fourth Amendment protects individuals against unreasonable searches and seizures, "Fourth Amendment rights are personal rights that may not be asserted vicariously." United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004) (citing Rakas v. Illinois, 439 U.S. 128, 133-34 (1978)). Therefore, a person seeking suppression of evidence on the basis of a Fourth Amendment violation "'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]'" Id. (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)). A defendant who "fails to prove a sufficiently close

connection to the relevant places or objects searched … has no standing to claim that they were searched or seized illegally." Id. at 529-30 (internal quotation and citation omitted).[3]  See also United States v. Russell, 847 F.3d 616, 618 (8th Cir. 2017) (quoting Barragan).   In Minnesota v. Olsen, 495 U.S. 91, 98-100 (1990), the Supreme Court held that an overnight guest enjoys a legitimate expectation of privacy in the host's home, and thus standing to claim Fourth Amendment protections relative to that home.  In Carter, "the [Supreme] Court distinguished an 'overnight social guest' from someone 'merely present with the consent of the householder' with no enforceable Fourth Amendment right in the premises."  United States v. Kuenstler, 325 F.3d 1015, 1020 (8th Cir. 2003).

The record before the Court establishes that Anderson did not live full time at his mother's Fox Haven address.  Yet Anderson was more than a mere social guest, he stayed at the Fox Haven address periodically, used the laundry facilities there, and kept and cared for his dogs there.  Anderson was free to come and go as he pleased at the Fox Haven home.  Anderson and his property were physically present at the premises when the police arrived on August 19, 2016.  Other evidence suggests, however, that Anderson also lived with his girlfriend, including at an apartment.  The question of standing, therefore, is close.[4]  On balance, the undersigned concludes that Anderson offered sufficient facts for the Court to conclude that he has standing to challenge the Fox Haven search, even though he did not live there fulltime.

## B.    Validity of Mr. Poole's Consent to Search

---

[3] "In order to have a legitimate expectation of privacy, the defendant must show (1) a subjective expectation privacy, and (2) the expectation is objectively reasonable." United States v. Williams, 521 F.3d 902, 905-06 (8th Cir. 2008) (citing Carter, 525 U.S. at 88).

[4] Where a court "finds facts supporting both sides such that it is not 'well positioned' to determine if a party had a reasonable expectation of privacy, it can examine instead the validity of the search." Marshall v. United States, 2008 WL 2775857 *6 (E.D. Mo. July 14, 2008) (quoting Kuenstler, 325 F.3d at 1021).

Regardless of whether Anderson has legal standing to challenge the August 19, 2016, search of 12897 Fox Haven, based on the totality of the circumstances, the undersigned finds that Mr. Poole voluntarily consented to the search of the premises and the police could reasonably rely on Mr. Poole's consent.  Although Ms. Sumpter eventually spoke with the police and purportedly indicated, in substance, that she intended to withdraw any consent that Mr. Poole had given, any attempted withdrawal occurred after the police had seized the incriminating evidence, namely the purse/bag and firearm.

### 1.    Relevant Legal Standards - Consent

The Fourth Amendment shields individuals from unreasonable searches and seizures by law enforcement.  United States v. Ramirez, 676 F.3d 755, 759 (8th Cir. 2012).  "'[A] search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions[.]'"  United States v. Anderson, 688 F.3d 339, 343 (8th Cir. 2012) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971)).  "Voluntary consent of the person whose home or property has been searched is [a] recognized exception."  Anderson, 688 F.3d at 343-44 (citing Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)).  See also Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).   Thus, "[c]onsensual searches are reasonable under the Fourth Amendment."  United States v. Beckmann, 786 F.3d 672, 677-78 (8th Cir. 2015) (citing Florida v. Jimeno, 500 U.S. 248, 250-51 (1991)).

It is the prosecution's burden to prove by a preponderance of the evidence that a person's consent to search was voluntary.  See United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (citing United States v. Matlock, 415 U.S. 164, 177 (1974)).[5]  Consent is voluntary "if it

---

[5] The voluntariness of consent is a question of fact.  Beckmann, 786 F.3d at 678 (citing United States v. Quintero, 648 F.3d 660, 665 (8th Cir. 2011)).  "[T]he reasonableness of an

was 'the product of an essentially free and unconstrained choice by its maker,' … rather than 'the product of duress or coercion, express or implied.'"  Id. (quoting Bustamonte, 412 U.S. at 225, 227).  In determining whether consent was voluntary, courts consider the totality of the circumstances, including the characteristics of the accused and details of the environment and interrogation in which the consent was given.  See id. at 380-81; United States v. Kelley, 594 F.3d 1010, 1013 (8th Cir. 2010) (quoting Chaidez).

"Consent may [also] be obtained ... 'from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" Anderson, 688 F.3d at 345 (quoting Matlock, 415 U.S. at 171.  "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so."  United States v. Williams, 521 F.3d 902, 906 (8th Cir. 2008).  Further, reviewing courts focus on the objective question "whether a reasonable officer would believe consent was given."  United States v. Correa, 641 F.3d 961, 967 (8th Cir.2011) (reversing grant of suppression).

Pursuant to the Eighth Circuit's guidance in Chaidez, district courts consider the totality of the circumstances, in view of a variety of non-exclusive factors, including, inter alia, the consenting party's age, mental ability, whether the individual was intoxicated, whether the individual was informed of his/her rights, and the environment in which consent is given.  See United States v. Quintero, 648 F.3d 660, 667 (8th Cir. 2011) (citation omitted).  See also Chaidez, 906 F.2d at 381.  The Chaidez factors, however, are not "applied mechanically," but serve to guide the analysis.  Id.

---

officer's reliance on such consent is a question of law …."  Id. (citing United States v. James, 353 F.3d 606, 615 (8th Cir. 2003)).

2.      **Analysis – Consent**[6]

It is not disputed that Robert Poole is a third party who lived at the Fox Haven residence. Thus, Mr. Poole would be an individual with at least apparent, if not actual, authority to consent to a search.  Further, it is not disputed that Mr. Poole did, in fact, consent to a search of that residence—first when he invited officers inside and second when he wrote his name on the consent to search form after Det. Merritt explained that form to him.

The more difficult question before the Court is whether a reasonable officer could believe that Mr. Poole's consent was valid.  Under the totality of the circumstances, the undersigned concludes that:  (1) Mr. Poole's consent was voluntary; and (2) a reasonable police officer in Det. Merritt's position could conclude that Mr. Poole, although disabled, manifested sufficient intellectual faculties to consent to a search of the residence.

Mr. Poole is an adult and there is no contention that he was intoxicated or under the influence of any drugs at the time in question.  Mr. Poole was not coerced, threatened or given any promises in order to induce his consent.  Mr. Poole was not restrained, arrested, or threatened with arrest prior to his consent.

Mr. Poole's appearance and demeanor at the evidentiary were generally consistent with Det. Merritt's description of him.  Although the parties do not dispute that Mr. Poole suffers from physical and intellectual limitations, those limitations are not so profoundly manifested or

---

[6] In its post-hearing submission, the government briefly argues that Anderson impliedly consented to the search of the Fox Haven home when he asked the arresting officer retrieve a pack of cigarettes from inside.  (ECF No. 42 at p. 2)  The flaw in the government's argument is that there is no evidence before the Court to suggest that the police went into the home to retrieve the cigarettes <u>and</u> in that course of retrieving cigarettes saw any evidence or contraband in plain view which was later seized.  The government has not offered any relevant case law to suggest asking an officer to retrieve property inside a home equates to consent to a full search of that home.  The record does not support a conclusion that Anderson gave his implied consent to search the Fox Haven home.

severe that a reasonable officer would conclude that he was not competent to consent.

Regarding Mr. Poole's limited mobility, the undersigned had the opportunity to observe Mr. Poole during the evidentiary hearing.  He was able to walk unassisted, albeit with a cane, and seat himself in the witness chair.

There is no doubt that Mr. Poole has vision problems and cannot read or write.  For example, when defense counsel asked Mr. Poole if he could identify a white Styrofoam cup, Mr. Poole stated that he saw a card.  On the other hand, Mr. Poole represented during his testimony that when the police arrested Anderson, he could see Anderson outside, both standing and sitting in the yard.  Further, the evidence and testimony indicated that, contrary to Ms. Sumpter's testimony, Mr. Poole was left alone at the Fox Haven residence at least early on August 19, 2016.  As noted above, the undersigned does not fully credit Ms. Sumpter's testimony concerning the extent of Mr. Poole's intellectual limitations.

Regardless of his intellectual, vision, and mobility limitations, Mr. Poole demonstrated no problems with his hearing and ability to understand questions posed to him.  The undersigned notes that Mr. Poole's responses to questions at the evidentiary were appropriate in terms of content and context.  Furthermore, during cross-examination, Mr. Poole asked the prosecutor to repeat an ambiguous question, and thereafter gave a cogent and contextually appropriate answer.

Mr. Poole's testimony demonstrated no significant problem with his ability to recall facts and circumstances with at least some reasonable degree of precision.  At the evidentiary hearing, Mr. Poole testified in considerable detail regarding his recollection of the events of August 19, 2016.  For example, he recalled that he was initially home alone on August 19, 2016, and that Anderson and Ms. Akins came to the home.  He also recalled coming upstairs and finding the front door open.  He recalled seeing Anderson outside, first standing and then sitting.  When shown a copy of the consent to search form, he could not read it but recalled seeing it before

based on the St. Louis County Police logo in the corner of the form.

Based on the testimony and evidence before the Court, the undersigned finds that Mr. Poole's intellectual and physical functioning may be limited, but it is not as limited as Ms. Sumpter's testimony would suggest.  Mr. Poole's own testimony indicated that he could walk up and down the steps of his home, and did so on August 19, 2016.  Mr. initiated contact with the police on August 19, 2016, when he approached the detectives and asked relevant questions concerning their presence at his home.

Significantly, Mr. Poole had the wherewithal to call his sister several times after he consented to the search of the premises.  The record makes clear that he made these calls without seeking permission or assistance from the police.  Mr. Poole eventually spoke with Ms. Sumpter when she returned his call, and he was fully capable of locating a police officer and giving the phone to the officer.  The fact that Mr. Poole would repeatedly call his sister demonstrates that he generally understood the significance of the police presence at his home that morning.

Additionally, there is no indication that anyone present at the Fox Haven residence actually advised the police that Mr. Poole suffered from any significant intellectual impairment that would render his consent objectively unreasonable.  Ms. Sumpter testified at length regarding Mr. Poole's disabilities, but she did not indicate that she told the police her brother had limited abilities.  Further, in a recorded jail call Anderson told Ms. Sumpter that Mr. Poole had enough common sense not to consent to the police.

It is important to note that the police honestly told Mr. Poole they were looking for weapons and Mr. Poole initially invited the police into the home.  Further, Det. Merritt read the consent to search form to Mr. Poole and filled out the majority of the form for him.  There is no evidence whatsoever that the police coerced, threatened, or tricked Mr. Poole into consenting to a search of the Fox Haven residence or printing his name on the form.  Mr. Poole was not

restrained and enjoyed sufficient freedom of movement that he was able to call his sister several times while the police were present.  The fact that Mr. Poole could not read or sign the consent to search form alone, based on the totality of all of the other facts and circumstances, is not sufficient to call into question Det. Merritt's reasonable reliance on Mr. Poole's invitation into the home and consent to search the residence.

Mr. Poole's ability to hear, comprehend, and respond appropriately to questions, as well has his independent decision to call Ms. Sumpter and advise her of the situation demonstrate that, despite his physical and intellectual limitations, a reasonable police officer could conclude that Poole retained a sufficient degree of understanding and free agency to consent to a search.

Based on the record before the Court, including the undersigned's observations of Mr. Poole during the evidentiary hearing, the undersigned finds Mr. Poole voluntarily consented to the search of 12897 Fox Haven, and that Det. Merritt's reliance on Mr. Poole's consent was objectively reasonable.  See Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990) (reasonable reliance standard).

### 3.  Analysis – Ms. Sumpter's Alleged Denial / Withdrawal of Consent

In his post-hearing submission, Anderson argues an additional basis for suppressing the evidence seized at the Fox Haven home.  Relying on Georgia v. Randolph, 547 U.S. 103, 120 (2006), Anderson contends that Ms. Sumpter spoke with the police and denied permission to enter the premises.  Anderson acknowledges that, because Ms. Sumpter was not physically present, her objection is not dispositive.  Nonetheless, Anderson suggests that Ms. Sumpter's objection to the search demonstrates that the officer's reliance on Mr. Poole's consent was unreasonable.

The record does not support Anderson's argument in this regard.  The record makes abundantly clear that Mr. Poole's attempts to call and speak with Ms. Sumpter failed.  Ms.

16

Sumpter was out-of-town visiting another son in prison and lacked ready access to her phone. The record is clear that Det. Adams was present when Ms. Sumpter finally returned Mr. Poole's calls. The record is equally clear that Det. Adams was not present at the outset of the events and arrived <u>after</u> the other officers had received permission to search the residence and seized the hand gun. Thus, to the extent Ms. Sumpter may have told the police to stop searching her house or otherwise withdrew Mr. Poole's consent, it was too late—the search had begun and the gun had been seized.

The undersigned recommends that the Court deny Anderson's motion to suppress evidence seized from 12897 Fox Haven.

## II.    <u>Motion to Suppress Statements</u>

In his motion to suppress as initially filed, Anderson also asks the Court to suppress statements he made to the police after his arrest on August 19, 2016.[7] Anderson gave statements at the scene of his arrest, and later in the afternoon at a police station. Anderson argues that he had recently undergone surgery and was on pain medication. As such, Anderson contends that he did not voluntarily and freely waive his right to counsel and to remain silent.

### A.    <u>Relevant Legal Standards – Motion to Suppress Statements</u>

Statements to law enforcement officers made during custodial interrogation are normally subject to the procedures set out in <u>Miranda v. Arizona</u>, 384 U.S. 436, 477-78 (1966). <u>United States v. LeBrun</u>, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). "Not every confession obtained absent the <u>Miranda</u> warnings is inadmissible, however, because 'police officers are not required to administer <u>Miranda</u> warnings to everyone whom they question.'" <u>Id.</u> (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)). Rather, <u>Miranda</u> warnings are required only when the

---

[7] Neither party specifically addressed the issue of Anderson's statements in their post-hearing submissions. (ECF Nos. 41, 41)

suspect is in custody <u>and</u> subjected to interrogation.  <u>See</u> <u>id.</u>  When applicable, such warnings must be given before questioning begins.  <u>See</u> <u>Miranda</u>, 384 U.S. at 444.

Because <u>Miranda</u> applies only to custodial interrogation, voluntary statements by a suspect which are not in response to questioning are not subject to <u>Miranda</u>.  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).  "Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody …."  <u>Illinois v. Perkins</u>, 496 U.S. 292, 296 (1990) (citation and quotation omitted).  Routine booking questions that are reasonably related to police record-keeping, however, are not related to the cautions of <u>Miranda</u>. <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 600-02 (1990); <u>United States v. Reyes</u>, 908 F.2d 281, 287-88 (8th Cir. 1990).  <u>See</u> <u>also</u> <u>United States v. Klein</u>, 13 F.3d 1182, 1184 (8th Cir. 1994) (<u>Miranda</u> warnings not required for "[g]eneral on-the-scene" questioning).

If, after being given <u>Miranda</u> warnings, a defendant agrees to make a statement, the government must show that the waiver was voluntary, knowing, and intelligent for the statements to be admissible at trial.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 169-70, 174 (1986); <u>North Carolina v. Butler</u>, 441 U.S. 369, 373-76 (1979); <u>Miranda</u>, 384 U.S. at 444, 475.  "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."  <u>LeBrun</u>, 363 F.3d at 724.  <u>See</u> <u>also</u> <u>United States v. Mshihiri</u>, 816 F.3d 997, 1004 (8th Cir. 2016) (quoting <u>LeBrun</u>); <u>United States v. Perry</u>, 714 F.3d 570, 574 (8th Cir. 2013) (quoting <u>LeBrun</u>).

"[I]t is not enough to show that the authorities' representations were the but-for cause of a confession."  <u>LeBrun</u>, 363 F.3d at 724.  "To determine whether a statement is voluntary [the Court] examine[s] the totality of the circumstances, including the 'conduct of the officers and the characteristics of the accused.'"  <u>United States v. Williams</u>, 793 F.3d 957, 962 (8th Cir. 2015)

(quoting LeBrun, 363 F.3d at 724).  The Supreme Court has explained that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' …."  Colorado v. Connelly, 479 U.S. 157, 167 (1986).  See also United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002); United States v. Robinson, 20 F.3d 320, 322 (8th Cir. 1994).

### B.    Analysis – Motion to Suppress Statements

Anderson gave two statements to the police on August 19, 2016.  There is no dispute that Anderson gave both statements in response to custodial interrogation.  There is also no dispute that the police provided Miranda warnings prior to questioning Anderson.  Thus, in order to be admissible, the government must show Anderson's statements were made voluntarily, following a knowing waiver of his Miranda rights.

The police administered Miranda warnings each time they questioned Anderson on August 19, 2016.  See United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996) (explaining that a finding that Miranda "warnings were given weighs in favor of a voluntariness finding") (citation omitted).  Each time he was questioned, Anderson indicated that he understood his rights and thereafter gave a statement—first to Det. Merritt at the Fox Haven scene, and later to Det. Adams at a police station.  There is no argument or suggestion that Anderson ever invoked his right to remain silent or requested counsel prior to the time that the police ceased questioning him.  See Missouri v. Seibert, 542 U.S. 600, 608-09 (2004) (explaining that issue of voluntariness "tends to end with the finding of a valid waiver"); Dickerson v. United States, 530 U.S. 428, 444 (2000) (advising that "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the [police] adhered to the dictates of Miranda are rare") (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984)).

In addition to the fact that the police administered Miranda warnings and Anderson

19

acknowledged those warnings, the detectives testified that Anderson did not appear intoxicated, and Det. Adams testified that Anderson did not appear to be in pain or discomfort. The undersigned credits that testimony. There is no evidence of coercive police conduct relative to any questioning of Adams. See Connelly, 479 U.S. at 167. Further, there is no evidence before the Court that anyone advised the police that Anderson's pain or pain medications interfered with his ability to freely and voluntarily make decisions. Thus, even if Anderson was in pain and/or on pain medication for his gunshot wound, those facts would not require the Court to suppress his statements to the police. See United States v. Contreras, 372 F.3d 974, 977, 978 (8th Cir. 2004) (confession found voluntary even though defendant recently used drugs because he appeared sober). See also United States v. Palmer, 203 F.3d 55, 60-61 (1st Cir. 2000) (confession held voluntary despite defendant's heroin withdrawal where defendant appeared clear-headed); United States v. Cristobal, 293 F.3d 134, 138-41 (4th Cir. 2002) (confession found voluntary despite questioning in hospital, while defendant was on pain medication following emergency surgery); United States v. Reynolds, 367 F.3d 294, 298-99 (5th Cir. 2004) (confession found voluntary despite lack of sleep and drug usage where the defendant was alert and cooperative and officers did not observe defendant to be under the influence of drugs).

The undersigned recommends that the Court deny Anderson's motion to suppress his statements.

## CONCLUSION

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements and Evidence and Supplemental Motion to Suppress (ECF No. 21, 41) be **DENIED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is

obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

The trial of this matter has been set for September 18, 2017, at 8:30 a.m., before the Honorable Catherine D. Perry, United States District Judge.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  24th   day of   July   , 2017.